IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA 04 MAR 31 PM 3:10
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES CALLAHAN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Civil Action Number |
| | ) | CV-01-C-0796-E |
| MICHAEL HALEY, Commissioner, | ) | |
| Alabama Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

**ENTERED**
**APR 1 - 2004**

## MEMORANDUM OPINION GRANTING PETITIONER'S WRIT OF HABEAS CORPUS

Invoking 28 U.S.C. § 2254, Petitioner James Callahan ("Petitioner" or "Callahan") seeks a writ of habeas corpus, averring that his death sentence is barred by the Constitution of the United States.[1] The Magistrate Judge has duly considered Callahan's petition, and he has issued a Report and Recommendation ("R&R"), in which he urges the Court to deny the habeas writ.

Two compelling considerations counsel against the adoption of the R&R.

First, the Court concludes that the Petitioner has been denied his Sixth Amendment right to a fair and impartial tribunal. Petitioner's conviction was based in large part on his

---

[1] This is Petitioner's first federal habeas petition. He has pursued an unsuccessful direct appeal and post-conviction remedies in the Alabama state courts.

1

37

fourth confession, given after two days of custodial interrogation. During this investigatory stage of the case, after a lawyer had been denied access to Petitioner, a circuit judge "went into the room where the deputies were questioning [the Petitioner].[2] He advised Petitioner of his *Miranda* rights and otherwise conversed with him. The same judge was assigned the case after Petitioner was indicted. At trial, a key issue was the voluntariness of the very confession which was "interrupted" by the trial judge. Prior to trial, Petitioner unsuccessfully sought the recusal of the judge, based on the judge's personal knowledge of the circumstances and conditions surrounding Petitioner's interrogation. The trial judge denied Petitioner's recusal motion.

Second, at the sentencing stage, Petitioner was denied his Sixth Amendment right to the effective assistance of counsel. At the sentencing stage, only one witness was called by Petitioner's inexperienced criminal lawyer: Petitioner's aunt-in-law, who basically expressed sympathy for the victim's family. There was no evidence of any substantial preparation for the sentencing hearing - which lasted less than an hour.

Thus, based on the Court's independent consideration of the record and the law, and notwithstanding the Magistrate Judge's R&R, the Court will grant the writ of habeas corpus.

## I. Procedural History

On June 26, 1982, Petitioner was convicted in the Circuit Court of Calhoun County of capital murder of Rebecca Suzanne Howell during the course of a kidnaping.[3] The jury

---

[2] *Callahan v. State of Alabama,* 471 So.2d 463, 469 (Ala.1985) ("*Callahan I*")

[3] *See* § 13A-5-40(a)(1), Alabama Code (1975).

2

recommended that Petitioner be sentenced to death, and Trial Judge Samuel H. Monk sentenced him to death on July 8, 1982. However, the conviction was overturned on appeal and remanded for a new trial. *Callahan* I.

Petitioner was again convicted of capital murder on November 12, 1987, and on November 25, 1987, Judge Monk again sentenced him to death. This second conviction was affirmed on appeal by the Alabama Court of Criminal Appeals, *Callahan v. State of Alabama,* 557 So. 2d 1292 (Ala. Crim. App. 1989) ("*Callahan* II"), and the Alabama Supreme Court, *Callahan v. State of Alabama*, 557 So. 2d 1311 (Ala. 1989). The United States Supreme Court denied Callahan's petition for certiorari on October 1, 1990. *Callahan v. Alabama*, 498 U.S. 881, 111 S. Ct. 216, 112 L. Ed. 2d 176 (1990).

On September 30, 1992, Petitioner filed a petition for post-conviction relief pursuant to Rule 32, Ala. R. Crim. P. An evidentiary hearing was held on July 1 and 2, 1996, before Judge Monk. On February 17, 1998, Judge Monk denied Petitioner's Rule 32 petition. The denial of the Rule 32 petition was affirmed by the Alabama Court of Criminal Appeals on April 30, 1999. *Callahan v. State of Alabama*, 767 So. 2d 380 (Ala. Crim. App. 1999) ("*Callahan* III"). The Alabama Supreme Court denied Callahan's petition for certiorari on March 31, 2000. *Callahan v. State of Alabama*, 767 So. 2d 405 (Ala. 2000).

## II. Factual Determinations

State court determinations of factual issues are entitled to a presumption of correctness in federal habeas proceedings. *See* 28 U.S.C. § 2254(e)(1). The Court therefore adopts the factual findings of the Alabama Court of Criminal Appeals and the Alabama Supreme Court

to the extent that they are supported by the record.[4]

> In *Callahan* II, the Alabama Court of Criminal Appeals found:
>
> Rebecca Howell disappeared on the night of February 3, 1982. Her body was discovered in Tallasseehatchee Creek in Calhoun County on February 17. Callahan was a suspect in her disappearance and murder.
>
> On February 22, 1982, Calhoun County Deputy Sheriff Johnny Alexander had maintained surveillance on Callahan's truck for five hours before Callahan came out of his father's house and drove away at 5:00 that morning.
>
> Deputy Alexander knew that the license tag on Callahan's truck was registered to another vehicle. He also knew that Callahan was a suspect in the Howell murder, and Deputy Alexander was familiar with that investigation. Deputy Alexander and Jacksonville Police Sergeant Kathy Thienes stopped Callahan for having a switched tag. Deputy Alexander testified that he "explained to [Callahan] that ... the tag he had on his vehicle didn't belong to that vehicle, and that we were going to write him a ticket for a switched tag." Alexander told him that "we would have to take him to jail to write him a ticket."
>
> At that time, the administrative policy of the sheriff's office did not permit deputies to carry "ticket books" in their vehicles. The sheriff's office was located in the county jail and the ticket book was kept there. Anyone stopped for a traffic violation was taken "to jail" where the citation was issued. This was standard
> procedure.
>
> When Callahan was stopped, his conduct was suspicious and he appeared to place something behind the seat of his truck. His truck was impounded and later searched pursuant to a search warrant.
>
> Deputy Alexander and Sergeant Thienes transported Callahan to the sheriff's office at the county jail. After Callahan had been issued a ticket for having a switched tag, Deputy Alexander told him that some investigators wished to talk with him. Callahan replied "okay" and Alexander told him "he could have a seat back by the television in the back of the lobby area of the county jail."

---

[4] Title 28 U.S.C. § 2254 (f) provides that a habeas petitioner may challenge the sufficiency of the evidence to support a State court determination of a factual issue by producing the relevant part of the record. Petitioner has done so in this case.

Although Deputy Alexander testified that Callahan was not free to leave at that time, he also testified that he never told or placed Callahan under arrest, never placed him in custody or in jail, and never told him that he could not leave.

Deputy Alexander candidly admitted that the primary reason Callahan was stopped was because he was a suspect. At trial, Alexander testified, and the State argued, that the purpose of taking Callahan to the sheriff's office was twofold: First, to issue him a ticket for having an improper tag; and second, to turn him over to the investigators of the disappearance and murder of Rebecca Howell. Deputy Alexander remained at the sheriff's office until 7:30 or 8:00 A.M. He testified that during that time "nothing appeared to be wrong with [Callahan] physically," but that he "appeared to be a little nervous."

Deputy Max Kirby arrived at the sheriff's office around 5:45 A.M. and observed that Callahan was watching television. He testified that, approximately thirty minutes after he arrived, he and Deputy Larry Amerson walked over to Callahan and told him they would like to talk with him. Callahan said "Okay" and continued to watch television. Kirby said that it would be a while and Callahan again replied "Okay." As best this Court can determine, Callahan was fingerprinted at 7:15 A.M. At approximately 7:45 A.M., Kirby went to the District Attorney's Office, returning over an hour later. When Kirby returned, Callahan was still watching television. At approximately 9:00 A.M., Deputies Kirby and Amerson served Callahan with a "probation tolling order/arrest warrant" issued by Circuit Judge Malcolm E. Street and placed him under arrest pursuant to that order.[5] Deputy Kirby then advised Callahan that he wished to talk with Callahan regarding the Howell case. Thereafter, Callahan gave four statements, two on February 22 and two on February 23. The substance of, and the circumstances surrounding, those statements are as follows:

(1) Beginning around 9:30 A.M. on the morning of February 22, Callahan gave his first statement in the presence of Deputy Kirby and Sergeant Thienes. This statement was transcribed by Kirby and bears Callahan's signature at the bottom of each page. Deputy Kirby testified that, prior to taking his statement, he advised Callahan of his *Miranda* rights. Callahan stated that he understood these rights and informed Kirby that he had an attorney, but that "he didn't

---

[5] In February of 1979, Callahan was convicted of assault with intent to murder and sentenced to 10 years' imprisonment. In May of 1979, he pleaded guilty and was convicted of assault with intent to murder. He was sentenced to two years' imprisonment to run concurrent with his prior sentence. In October of 1979, Callahan was granted probation.

need him right then" and "would let [Kirby] know when he needed him." Kirby wrote down the name, address, and telephone number of his attorney. Callahan then executed a waiver of rights, which was witnessed by both Kirby and Thienes. Deputy Kirby testified that, while he was present, Callahan was neither threatened nor offered any reward or hope of reward in order to induce him to make a statement.

In this statement, Callahan maintained that, on the night Ms. Howell disappeared, he washed clothes at a Jacksonville washateria and then went to the Jacksonville Hospital where his father was visiting his mother. Around 11:00 P.M., he left the hospital with his father and they traveled in separate vehicles to his father's house in Anniston. He remained there for the rest of the night.

(2) Callahan gave a second statement on the afternoon of February 22, beginning around 1:45 P.M. and ending at 3:25 P.M. In his statement, Callahan claimed that he was washing clothes in a Jacksonville washateria on the night of February 3 when he saw Ms. Howell, whom he had met before. They entered into a conversation, during which she stated that she was engaged to be married, and Callahan offered to rent his mobile home to her and her future husband. According to Callahan, Ms. Howell wished to view the mobile home that night. Around midnight, they left the washateria in his truck and drove to the mobile home, which was located just outside Jacksonville in rural Calhoun County. While they were at the mobile home, Callahan's estranged wife (whom he had earlier observed in an automobile outside the laundromat) came in, pointed a gun at Callahan, accused him of cheating on her, and forced him to tape Ms. Howell's hands together with tape from the kitchen cabinet. Callahan then managed to escape out the back door and leave in his truck. Shortly after completing this statement, Callahan changed portions of it to add that he had dated Ms. Howell prior to February 3 and that he and Ms. Howell were having sexual intercourse when his wife arrived at the mobile home.

This statement was given in the presence of Assistant District Attorney Joseph D. Hubbard, Deputy Kirby, Deputy Larry Amerson, and Ms. Diana Hinds, a court reporter, who subsequently transcribed the statement. Hubbard testified that, prior to any questioning, Callahan was advised of his *Miranda* rights by Deputy Amerson and executed a written waiver of counsel. Hubbard also stated that no one offered Callahan any reward or hope of reward in return for making a statement, nor did any one threaten Callahan in any manner to induce him to make a statement. Prior to actually giving this statement, Callahan said, "I know of my rights. I wish to give a statement at this particular time in order to help clear my own personal self."

6

(3) The third statement was given by Callahan around 10:15 on the morning of February 23. Earlier that morning, at Callahan's request, law enforcement officers had obtained a photograph from Callahan's father's house. In his statement, Callahan identified the girl in the photograph as one Malera Fox and asserted that she resembled Ms. Howell. According to Callahan, Mrs. Fox had once expressed interest in him, causing his wife to become jealous. He suggested that his wife mistook Ms. Howell for Mrs. Fox at his mobile home on the night of February 3.

This statement was made in the presence of Assistant District Attorney Hubbard, Deputy Kirby, and Sergeant Thienes. Hubbard taped this statement and it was later transcribed by Ms. Parian Tidwell, a court reporter. Hubbard testified that, prior to any questioning, Deputy Kirby advised Callahan of his *Miranda* rights and Callahan executed a written waiver of rights. At that point, Hubbard stated that he "asked Mr. Callahan or stated to him, 'All right. Jimmy, with these rights in mind, do you wish to talk to us about what we were talking about yesterday?' And the Defendant stated, 'Yes, I'll continue talking because I'm trying to clear myself.' And I stated to the Defendant, 'All right, sir. But you voluntarily are talking to us?' The Defendant stated, quote, 'Right,' unquote. Then I asked, 'Is that correct? Okay. And you understand all of those rights?' And Mr. Callahan stated, 'Yes, I really do.' " Hubbard also stated that no reward or hope of reward was offered to Callahan nor was Callahan threatened in any manner to obtain this statement.

(4) The most damaging statement was given by Callahan on the afternoon of February 23, beginning around 2:45 P.M. Present during this statement were Mr. Hubbard, Deputy Kirby, Sergeant Thienes, Sergeant Lawton Hall, and Ms. Hinds, the court reporter who later transcribed the statement. The circumstances surrounding the taking of this statement were described by Hubbard. Prior to giving this statement, Callahan was again advised of his constitutional rights by Deputy Kirby and executed a written waiver of counsel. Hubbard testified that the statement that followed was given voluntarily by Callahan and that no one threatened Callahan nor did anyone offer him a reward or hope of reward in return for the statement. In this statement, Callahan admitted that he forced Ms. Howell to leave the laundromat with him. He took her to his mobile home where he held her prisoner for two days. On the night of February 4, she agreed to have sexual intercourse with him in return for his releasing her and they, in fact, had sexual intercourse. On the night of February 5, he taped her hands together and began to drive her to an area near some houses where he planned to release her. However, near the creek in which her body was later found, she jumped out of

the truck and ran toward the creek. Callahan stated that Ms. Howell's boots, pantyhose, and socks were in the back of his truck and that he threw the boots out on his drive back.

. . . .

Callahan did not give any other formal statements [after February 24]. However, on February 24, he offered to show law enforcement officers where he had discarded Ms. Howell's boots. He drove around with the officers directing them to certain locations. Although he was unable to locate Ms. Howell's boots on this expedition, Callahan did lead officers to Ms. Howell's purse, which was found behind a woodpile at the home of Callahan's father-in-law, located in Collinsville, Alabama. Callahan also directed the officers to his father's house in Anniston where he retrieved from his camper a knife which he said was lying on the dashboard of his truck the night he forced Ms. Howell to leave the laundromat with him. Ms. Howell's boots were subsequently turned over to law enforcement personnel by Callahan's brother-in-law, Paul Henninger, who had found them around February 21 in Callahan's mobile home.

Deputy Kirby testified that the officers had no intention of talking with Callahan after attorney Lybrand's arrival on February 23. However, between 11:00 and 11:30 A.M. on February 24, Callahan sent word to Deputy Kirby through a trusty that he wished to talk to Kirby. Some twenty minutes after receiving this message, Kirby had Callahan brought to him and he orally informed Callahan of his *Miranda* rights. Callahan stated that he understood these rights and then told Kirby that he could show Kirby where he threw Ms. Howell's boots out of his truck.

Deputy Kirby read and explained to Callahan a waiver of counsel form and a consent form for Callahan to accompany law enforcement officers on a search for Ms. Howell's "boots, socks, and other items of clothing." Callahan stated that he understood these documents and then signed both forms. Sheriff Snead testified that no reward or hope of reward was offered to Callahan nor was Callahan threatened in order to induce him to accompany the officers on this trip.

Callahan took the stand only at the hearing on his motion to suppress. In contradiction of the State's evidence set forth above, Callahan denied that he was served with the probation tolling order, denied that he was ever informed of his constitutional rights at any time, and denied signing any of the waiver of counsel forms. He stated that he asked to call an attorney some twenty to

twenty-five times, but that these requests were refused; that Deputy Kirby threatened and physically mistreated him, with some of this taking place in the presence of Joe Hubbard; that "Kirby mentioned a couple of times things go easier on you if you give statements or whatever"; that he was not given food or drink; that he was in poor condition physically due to lack of sleep and the consumption of alcohol and drugs; that he did not voluntarily go on the trip with the officers on February 24. Callahan maintained that he "wasn't voluntarily doing anything." He also asserted that the statements transcribed by Ms. Hinds were incorrect and did not reflect what he actually said. In response to the trial judge's question as to why, when he (the judge) and attorney Lybrand came into the interrogation room, Callahan did not appeal to them for assistance, Callahan replied that he "did make efforts to Mr. Lybrand for help" and "advised him what was going on at that time."

A copy of attorney Lybrand's testimony from the prior trial was introduced by Callahan at the suppression hearing. This testimony merely recounts that Lybrand went to the Calhoun County Jail on the afternoon of February 23 at the request of Callahan's father. He spoke with Sheriff Snead and requested to talk with Callahan, but was not permitted to do so. Lybrand then went to Judge Monk's office and "explained to him that [he] had been contacted by the family and that [he] had told them that [he] would go down to the jail and see if [he] could talk to Mr. Callahan." Lybrand returned to the jail with Judge Monk, who entered the interrogation room, and, shortly thereafter, Lybrand was allowed to talk with Callahan. Around 5:00 that afternoon, Lybrand called the Callahan family to explain that, due to his personal relationship with the family of the victim, he was unable to represent Callahan in this matter. Lybrand conveyed this same information to the District Attorney the next morning. There is nothing in Lybrand's testimony to indicate that Callahan informed him of the alleged mistreatment, abuse, and deprivation that Callahan asserts he received at the hands of law enforcement officers. Lybrand did testify that, when he entered the interrogation room, Callahan "appeared to be tired and somewhat emotional."

In rebuttal, Deputy Kirby stated unequivocally that he did not threaten or physically abuse Callahan in any way; that Callahan "was very eager to cooperate"; and that this cooperation was not the result of any threats or promises. Assistant District Attorney Hubbard also testified in rebuttal. He stated that Callahan never requested to use the telephone; that he observed Callahan drinking several soft drinks and asked Callahan several times if he wanted anything to eat or drink; that Callahan did not at any time appear to be

9

sedated or suffering from any emotional or mental distress; that he had read the statements transcribed by Ms. Hinds and they were "exactly what Mr. Callahan said on those occasions"; that Deputy Kirby never threatened or intimidated Callahan in his presence; and that he saw Callahan sign three of the waivers introduced. Hubbard had previously testified that, during the three statements made in his presence, Callahan never requested to see an attorney; did not appear to be under any stress whatsoever, except that he did become "emotional" and "whimper[ed]" at times during the last statement, which was the only statement in which he admitted abducting Ms. Howell; was allowed to drink and eat; and, overall, was eager to cooperate.

*Callahan* II, 557 So. 2d at 195-98.

### Judge Monk's Involvement in the Investigatory Stage

The record itself is the best evidence of the verbal interaction between Judge Monk and the Petitioner while he was giving his fourth confession on February 24.

> MR. HUBBARD: Jimmy, is there anything else you want to add of your own free will at this time?
>
> MR. CALLAHAN: I didn't mean to hurt anybody. She just jumped out and run.
>
> JUDGE MONK: Mr. Callahan, I'm Judge Monk. Now I know you've been explained your rights so far. I want to run over those rights with you once again. Do you understand what I'm saying?
>
> MR. CALLAHAN: Right
>
> JUDGE MONK: All right. And do you understand that you have the right to remain silent in this case and not cooperate with the police in anyway?
>
> MR. CALLAHAN: Right.

JUDGE MONK: Do you understand that anything that you tell them can and will be used against you in court by the State in the prosecution of this case?

MR. CALLAHAN: Yes, sir. I do.

JUDGE MONK: Do you understand that you have the right to discuss the case or talk with an attorney before any questioning proceeds?

MR. CALLAHAN: Right.

JUDGE MONK: All right. And do you understand that if you cannot afford to hire an attorney that an attorney will be appointed to represent you and that the questioning will stop until such time as you've had an opportunity to talk with that attorney?

MR. CALLAHAN: I understand all that.

JUDGE MONK: All right. Do you understand that you can stop at any time that you wish to? In other words, that you can stop answering their questions at any time you want to? Do you understand all of that?

MR. CALLAHAN: Right.

JUDGE MONK: Now, it's my understanding that you told them you do not wish to have an attorney with you: is that correct?

MR. CALLAHAN: I don't need one. I just –

JUDGE MONK: All right, Now, let me tell you—listen to me, please, Mr. Callahan. Your father has retained the services of an attorney by the name of Fred Ray Lybrand. Do you know Mr. Lybrand?

11

MR. CALLAHAN:   Yes sir.

JUDGE MONK:   Do you want to talk with Mr. Lybrand or would you just—do you want to go ahead and continue talking with the police officers without talking to him? It's your personal decision, Mr. Callahan, and it must be made by you, not your father.

MR. CALLAHAN:   I'm not trying to hide anything. I just—I'm just upset. I don't want —I don't want anybody to get hurt over this. It wasn't intentions of nobody getting hurt.

JUDGE MONK:   Do you understand my questions? Mr. Lybrand is available to speak with you if you want to talk with him, but no one is forcing you or telling you that you have to talk with him. It's your choice. I'm going to ask you again, would you like to talk to Mr. Lybrand before you go any further or would you like to waive your right to talk to Mr. Lybrand?

MR. CALLAHAN:   Hold on for just a second. Can I talk to you just a minute?

JUDGE MONK:   Mr. Callahan, you cannot look to the police officers to advise you as to your rights. That's something I've advised you to, and I know they've given you your rights. But it's a decision that you have to make. Now, I'm going to ask you one more time. Do you wish to speak to Mr. Lybrand or do you want me to tell Mr. Lybrand that you do not wish to speak with him?

MR. CALLAHAN:   If my father sent him down here, I might ought to talk to him briefly. But that would be about all.

JUDGE MONK:   That's your choice. And they'll stop all proceedings at this point.

R. 742-742. The exchange between Judge Monk and Petitioner occurred in the presence of assistant district attorney Hubbard, three deputy sheriffs, and a court reporter.

## Ineffective Assistance of Counsel Claim

The Court of Criminal Appeals found that

At the penalty phase, Callahan was represented solely by Harold P. Knight. Since Knight is deceased, there was no testimony presented at the evidentiary hearing about what kind of investigation was done to prepare for the penalty phase. Carolyn Callahan [Callahan's sister] was the only witness to testify for Callahan at the penalty phase. She pleaded with the jury to recommend a sentence of life without parole.

*Callahan* III, 767 So.2d at 399.

The Court of Criminal Appeals' finding that Carolyn Callahan was Petitioner's sister is belied by the trial judge's finding: "The Defendant put on little evidence in mitigation. His aunt, by marriage, basically asked the Jury to spare the Defendant's life." Sentencing Order at C-109, Tab R-56.

Petitioner's counsel failed to call Petitioner's mother as a witness. As she did at the post-conviction proceeding, Petitioner's mother would have testified that Petitioner's upbringing was marked by physical violence. Indeed, Petitioner's father was an abusive, alcoholic man, who was a Golden Gloves boxer in the Air Force. He physically and sexually abused Petitioner's mother throughout their marriage; he also abused his children. In fact, when Petitioner was nine years old, his father chased him, his mother and his siblings with a knife. She would have testified that contrary to the testimony of Carolyn Callahan, she was not too ill to have testified at the penalty phase of Petitioner's trial; that she was both able and willing to come and testify if Petitioner's lawyers had only contacted her. *Id.,* 47, 50, Tab

13

R-47.

It is undisputed that criminal defense was not a specialty of Knight's, and that the experienced criminal lawyer for Petitioner was Louis Wilkerson. Rule 32 Evidentiary Hearing at 21, Tab R-47. There is no evidence that *any* substantial mitigation investigation or strategy was discussed or implemented by defense counsel. In fact, Petitioner's experienced criminal lawyer was not present for the penalty trial. *Id.,* at 27. The entire penalty phase - from opening statements, evidence, closing statements, through jury instructions - consumed less than sixty minutes! R. 959, Tab R-21.

Equally crucial was the failure of Petitioner's counsel to present any psychological evidence . As reflected at the Rule 32 hearing, such evidence was available. Dr. John Goff, a nueropsychologist and forensic examiner, performed an extensive nueropsychological assessment of Petitioner. The assessment indicates that Petitioner suffers from cognitive defects and a paranoid personality disorder. Even though Judge Monk discredited Dr. Goff's findings, a jury may well not have reached the same decision. This evidence would certainly have been admissible; it should have been heard by the jury.

### III. The Applicable Legal Standards

Since the seminal case of *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437 (1927), the guiding constitutional principle has been settled: "[I]t certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal,

substantial, pecuniary interest in reaching a conclusion against him in his case." *Tumey*, 273 U.S. at 523; 47 S.Ct at 441. *See Aetna Life Insurance Co. v. LaVoie,* 475 U.S. 813; 106 S.Ct. 1580 (1986).

In the case, *In re Murchison*, 349 U.S. 133, 75 S.Ct. 623 (1955), the petitioners, Detroit policemen, were called as witnesses before a "one-man judge-grand jury." Incredulous of their testimony, the Judge then charged both with perjury. He proceeded to try them in open court and to sentence them for contempt. In setting aside the convictions, Justice Black wrote:

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases whenever he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that 'Every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law. [*Citing Tumey v. Ohio, supra*). Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way, 'justice must satisfy the appearance of justice.' Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13.
> . . . A single 'judge-grand jury' is even more a part of the accusatory process than an ordinary lay grand juror. Having been a part of that process a judge cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused. While he would not likely have all the zeal of a prosecutor, it can certainly not be said that he would have none of that zeal. Fair trials are too important a part of our free society to let prosecuting judges be trial judges of the charges they prefer.

*Murchison*, 349 U.S. at 136, 137; 75 S.Ct. at 625, 626.

It is the duty of law enforcement officers, as a part of their accusatorial role, to give

15

notice of *Miranda* before conducting a custodial interrogation. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602 (1966); *United States v. Bosby,* 675 F.2d 1174, 1181 (11th Cir.1982);

Criminal defendants are guaranteed the right to present a complete defense. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (holding that excluding testimony about the circumstances of a confession deprives a defendant of his constitutional right to present a complete defense).

In deciding whether a confession is voluntary, a court should consider the "totality of the circumstances" *Id.* at 227. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

In *Williams v. Taylor*, 529 U.S. 362 (2000), the United States Supreme Court held that a trial lawyer's failure to investigate and present available mitigating evidence in a capital murder case can violate the Sixth Amendment right to counsel. To be sure, before this Court can find prejudice and a constitutional violation, it must be determined that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."

A defendant in a criminal case has a Sixth Amendment right to the effective assistance of counsel. To establish a violation of this right, a defendant must establish 1) that his counsel's performance fell below an objective standard of reasonableness, and 2) that counsel's deficient performance prejudiced the defendant, resulting in an unreliable or fundamentally unfair outcome of the proceeding. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984).

An ineffective assistance of counsel violation must rest on a a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694.

An attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness." *Blake v. Kemp*, 758 F.2d 523, 533 (11th Cir. 1985), *cert. denied*, 474 U.S. 998 (1985) ); *See also, Middleton v. Dugger*, 849 F.2d 491 (11th Cir. 1988) (where a defendant's counsel at the penalty phase fails to discover and present substantial available documentary evidence of defendant's psychiatric history, he has been denied the effective assistance of counsel.)

## IV. Analysis

At trial, the voluntariness of Defendant's fourth confession was a crucial element. The trial judge has "interrupted" this confession, ostensibly to give Petitioner notice of his Miranda rights and of the availability of a lawyer. But during this interruption, the judge acquired knowledge of hotly contested facts concerning the circumstances under which the confession was given. He no doubt observed Petitioner's demeanor. He observed and experienced the conditions under which the confession had been extracted during the preceding thirty hours.

Indeed, the judge assumed the role of the prosecutor. He eschewed his judicial role

17

of simply entering an order requiring the sheriff and deputies to permit access to Petitioner by the lawyer hired by Petitioner's father. Instead, armed with extra-judicial facts from extraneous and unknown sources (e.g., "Now I know you've been explained your rights so far;" "Now, it's my understanding that you told them you do not wish to have an attorney with you: is that correct?"), he proceeded to inform Petitioner of his *Miranda* rights. But even more appalling is that on *four separate occasions,* in the presence of the district attorney and law enforcement officers, Judge Monk advises Petitioner that he has a right *not* to talk with the lawyer retained by Petitioner's father. No other constitutional right was emphasized so repetitively by the judge.

During this interaction with Petitioner, the judge at one point apparently noticed that for whatever reason, Petitioner's attention was elsewhere.[6] Probably like Attorney Lybrand, the judge noticed that Petitioner appeared to be tired and somewhat emotional. It is most unreasonable to assume that the judge acquired no knowledge of at least some of the facts surrounding Petitioner's fourth confession when he visited Petitioner during the pre-indictment investigatory stage of this case. He certainly heard Petitioner exclaim: "I'm just upset." R. 744. The judge was certainly a witness to 1) the conditions of the interrogation room, 2) Petitioner's demeanor and mental/emotional state, 3) the appearance of the law enforcement officials in the interrogation room.

If the judge had testified at trial as a witness, and confirmed the testimony of Attorney Lybrand and parts of the testimony of Petitioner, his testimony would likely have carried

---

[6] "Now let me tell you – listen to me please, Mr. Callahan." R. 744.

much more weight than the testimony of other witnesses. His refusal to recuse himself deprived Petitioner of that opportunity.

The other side of this double-edged sword is that the judge was the factfinder on the voluntariness issue before it was submitted to the jury. How could he possibly have approached this judicial function without at least the subconscious recognition of his personal knowledge of some of the facts surrounding the confession? How could the appearance of partiality not be avoided by his role as the trial judge after he has assumed the role of the prosecutor in the pre-indictment stage of the proceedings?

For these reasons, Petitioner has been denied his right to a fair trial by a fair tribunal as well as his right to present a full and complete defense.

The State Courts' and the Magistrate Judge's R&R do not address the implications of *Tumey* and *Murchison*. Clearly, they are controlling precedents of the United States Supreme Court.

Moreover, Petitioner was sentenced to death in the virtual absence of mitigation evidence. This absence was not due to lack of evidence, but rather it was the result of his counsel's failure to develop and present it. *Williams* teaches that in such circumstances, the Sixth Amendment right to the effective assistance is offended.

Had Petitioner's mother testified at his trial, as she would have done if her son's counsel had contacted her, and had evidence of Petitioner's dysfunctional upbringing, his paranoid personality disorder, and his cognitive defects been presented to the jury which recommended his death, there is a reasonable probability that the result of the proceedings

would have been different. *See Strickland, supra.*

There is no basis in this record for a conclusion that counsel made a strategic decision to forego substantial and available testimony and evidence. Counsel's failure to uncover this mitigation evidence was highly unreasonable, indeed, under the circumstances, quite inexplicable. Counsel simply provided no defense to the death penalty.

Petitioner suffered the ultimate prejudice from his counsel's failure to investigate and present available and substantial mitigating evidence.

### IV. Conclusion

By separate order, the writ of habeas corpus will be granted.

Done this _____3/st_____ day of March, 2004.

_____
Chief United States District Judge
U.W. Clemon

20