FILED
2005 Feb-16  PM 04:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| **JAMES CALLAHAN**, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| **vs.** ) | Civil Action Number |
| ) | **1:01-cv-0796-UWC** |
| **MICHAEL HALEY, Commissioner,** ) | |
| **Alabama Department of Corrections,** ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION ON THE MERITS
OF ALL OF PETITIONER'S CLAIMS**

Invoking 28 U.S.C. §2254, Petitioner James Callahan seeks a writ of habeas corpus, averring that his death sentence is barred by the Constitution of the United States.[1] The Magistrate Judge has duly considered Callahan's petition, and he has issued a Report and Recommendation, in which he urges the Court to deny the habeas writ.  Pursuant to the January 18, 2005, remand of the United States Court of Appeals For the Eleventh Circuit, the Court herein addresses all of the Petitioner's claims .

---

[1] This is Petitioner's first federal habeas petition.  He has pursued an unsuccessful direct appeal and post-conviction remedies in the Alabama state courts.

1

I. **Petitioner's Claim That He Received Ineffective Counsel Due To His Trial Counsel's Failure To Object To The Admission Of His Statements**

The Court approves and expressly adopts herein Section I, pages 11-28, and specifically pages 27-28 of the Magistrate Judge's Report and Recommendation ("R&R")(Doc. 23).

II. **Petitioner's Claim That He Received Ineffective Assistance Of Counsel At Sentencing Due To His Counsel's Failure To Investigate And Present Additional Mitigating Evidence**

Petitioner claims that he was denied his Sixth Amendment right to the effective assistance of counsel at the sentencing stage.

Petitioner was represented by Louis Wilkerson ("Wilkerson"), an experienced criminal lawyer, and Harold Knight ("Knight"), an inexperienced criminal lawyer. Petitioner's experienced criminal lawyer, Wilkerson, was not present for the penalty phase of the trial. (Rule 32 Evidentiary Hearing at 27, Tab R-47.) It is undisputed that criminal defense was not a specialty of Petitioner's inexperienced criminal lawyer, Knight. (*Id*. at 21.)

There was no evidence that Petitioner's counsel conducted any substantial preparation for the sentencing hearing, which lasted less than an hour. At the sentencing stage, the only witness called by Knight was Petitioner's aunt-in-law,[2] who basically expressed sympathy

---

[2] The Court of Criminal Appeals' finding that Carolyn Callahan was Petitioner's sister is belied by the trial judge's finding: "The Defendant put on little evidence in mitigation. His aunt, by marriage, basically asked the Jury to spare the Defendant's life." (Sentencing Order at C-109, Tab R-56.)

2

for the victim's family. Petitioner's counsel did not contact Petitioner's mother to testify on the Petitioner's behalf regarding his dysfunctional childhood.

Prior to the hearing, Dr. John Goff, a neuropsychologist and forensic examiner, performed a psychological assessment on Petitioner. The assessment indicated that Petitioner suffers from cognitive defects and a paranoid personality disorder. At the sentencing hearing, Counsel for the Petitioner failed to present any evidence of the psychological assessment performed by Dr. John Goff.

To prove a violation of the right to counsel at the sentencing stage, a defendant must establish (1) that his counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant, resulting in an unreliable or fundamentally unfair outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668 (1984). An ineffective assistance of counsel violation must rest on a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694.

An attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness." *Blake v. Kemp*, 758 F.2d 523, 533 (11th Cir.1985), *cert. denied*, 474 U.S. 998 (1985); *see also*, *Middleton v. Dugger*, 849 F.2d 491 (11th Cir. 1988) (where a defendant's counsel at the penalty phase fails to discover and present substantial available documentary evidence of defendant's psychiatric history, he has been

denied the effective assistance of counsel.)

In *Williams v. Taylor*, 529 U.S. 362 (2000), the United States Supreme Court held that a trial lawyer's failure to investigate and present available mitigating evidence in a capital murder case can violate the Sixth Amendment right to counsel. To be sure, before this Court can find prejudice and a constitutional violation, it must be determined that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694.

Petitioner was sentenced to death in the virtual absence of mitigation evidence. Petitioner's counsel failed to present any psychological evidence at the sentencing hearing. As reflected at the Rule 32 hearing, such evidence was available. Dr. John Goff's assessment indicates that Petitioner suffers from cognitive defects and a paranoid personality disorder. Even though Judge Monk discredited Dr. Goff's findings, a jury may well not have reached the same decision. This evidence would certainly have been admissible; it should have been heard by the jury. Had evidence of Petitioner's paranoid personality disorder and his cognitive defects been presented to the jury which recommended his death, there is a reasonable probability of a different outcome of the proceedings. *See Strickland,* 466 U.S. at 694.

Equally crucial was Petitioner's counsel's failure to contact Petitioner's mother to testify. Had Petitioner's mother testified regarding Petitioner's dysfunctional upbringing, there is a reasonable probability that the result of the proceedings would have been different. *See Strickland,* 466 U.S. at 694.

There is no basis in this record for a conclusion that counsel made a strategic decision to forego substantial and available testimony and evidence. Counsel's failure to uncover this mitigation evidence was highly unreasonable, indeed, under the circumstances, quite inexplicable. Counsel simply provided no defense to the death penalty.

Thus, Petitioner was sentenced to death in the virtual absence of mitigation evidence. The entire penalty phase, from opening statements, evidence, closing statements, through jury instructions, consumed less than sixty minutes. (R. 959, Tab R-21.) There is no evidence that any substantial mitigation investigation or strategy was discussed or implemented by defense counsel. This absence of mitigation evidence was not due to a lack of evidence, but rather it was the result of his counsel's failure to develop and present it. *Williams* teaches that in such circumstances, the Sixth Amendment right to the effective assistance is offended.

Petitioner suffered the ultimate prejudice from his counsel's failure to investigate and present available and substantial mitigating evidence.

Petitioner is thus entitled to a writ of habeas corpus on this Claim.

### III.  Petitioner's Claim That The Trial Judge's Failure To Recuse Himself Violated His Sixth Amendment And Due Process Rights To A Fair Trial

Petitioner claims that he has been denied his Sixth Amendment right to a fair and impartial tribunal.

Petitioner's conviction was based in large part on his fourth confession, given after two days of custodial interrogation. During this investigatory stage of the case, after a lawyer had been denied access to Petitioner, Circuit Judge Samuel Monk "went into the room where

the deputies were questioning [the Petitioner]."[3] He advised Petitioner of his *Miranda* rights and otherwise conversed with him. The exchange between Judge Monk and Petitioner occurred in the presence of Assistant District Attorney Hubbard, three deputy sheriffs, and a court reporter. The record itself is the best evidence of the verbal interaction between Judge Monk and the Petitioner while he was giving his fourth confession on February 24, 1982.

> MR. HUBBARD: Jimmy, is there anything else you want to add of your own free will at this time?
>
> MR. CALLAHAN: I didn't mean to hurt anybody. She just jumped out and run.
>
> JUDGE MONK: Mr. Callahan, I'm Judge Monk. Now I know you've been explained your rights so far. I want to run over those rights with you once again. Do you understand what I'm saying?
>
> MR. CALLAHAN: Right.
>
> JUDGE MONK: All right. And do you understand that you have the right to remain silent in this case and not cooperate with the police in anyway?
>
> MR. CALLAHAN: Right.
>
> JUDGE MONK: Do you understand that anything that you tell them can and will be used against you in court by the State in the prosecution of this case?
>
> MR. CALLAHAN: Yes, sir. I do.
>
> JUDGE MONK: Do you understand that you have the right to discuss the case or talk with an attorney before any questioning proceeds?

---

[3] *Callahan v. State of Alabama*, 471 So.2d 463, 469 (Ala. 1985).

MR. CALLAHAN:   Right.

JUDGE MONK:   All right. And do you understand that if you cannot afford to hire an attorney that an attorney will be appointed to represent you and that the questioning will stop until such time as you've had an opportunity to talk with that attorney?

MR. CALLAHAN:   I understand all that.

JUDGE MONK:   All right. Do you understand that you can stop at any time that you wish to? In other words, that you can stop answering their questions at any time you want to? Do you understand all of that?

MR. CALLAHAN:   Right.

JUDGE MONK:   Now, it's my understanding that you told them you do not wish to have an attorney with you: is that correct?

MR. CALLAHAN:   I don't need none. I just-

JUDGE MONK:   All right. Now, let me tell you - listen to me, please, Mr. Callahan. Your father has retained the services of an attorney by the name of Fred Ray Lybrand. Do you know Mr. Lybrand?

MR. CALLAHAN:   Yes sir.

JUDGE MONK:   Do you want to talk with Mr. Lybrand or would you just - do you want to go ahead and continue talking with the police officers without talking to him? It's your personal decision, Mr. Callahan, and it must be made by you, not your father.

MR. CALLAHAN:   I'm not trying to hide anything. I just - I'm just upset. I don't want - I don't want anybody to get hurt over this. It wasn't intentions of nobody getting hurt.

JUDGE MONK:   Do you understand my questions? Mr. Lybrand is available to speak with you if you want to talk with him, but no one is forcing you or telling you that you have to talk with him. It's

7

                                    your choice. I'm going to ask you again, would you like to talk to Mr. Lybrand before you go any further or would you like to waive your right to talk to Mr. Lybrand?

MR. CALLAHAN:    Hold on for just a second. Can I talk to you just a minute?

JUDGE MONK:    Mr. Callahan, you cannot look to the police officers to advise you as to your rights. That's something I've advised you to, and I know they've given you your rights. But it's a decision that you have to make. Now, I'm going to ask you one more time. Do you wish to speak to Mr. Lybrand or do you want me to tell Mr. Lybrand that you do not wish to speak with him?

MR. CALLAHAN:    If my father sent him down here, I might ought to talk to him briefly. But that would be about all.

JUDGE MONK:    That's your choice. And they'll stop all proceedings at this point.

(R. 742-742.)

During this interaction with Petitioner, the judge at one point apparently noticed that for whatever reason, Petitioner's attention was elsewhere.[4] Probably like Attorney Lybrand, the attorney retained by Petitioner's father, the judge noticed that Petitioner appeared to be tired and somewhat emotional.

The same judge was assigned the case after Petitioner was indicted. Prior to trial, Petitioner sought the recusal of the judge, based on the judge's personal knowledge of the circumstances and conditions surrounding Petitioner's interrogation. The trial judge denied Petitioner's recusal motion.

---

    [4] "Now let me tell you - listen to me please, Mr. Callahan." (R. 744.)

8

At trial, the voluntariness of Defendant's fourth confession was a crucial element. The trial judge "interrupted" this confession, ostensibly to give Petitioner notice of his Miranda rights and of the availability of a lawyer. But during this interruption, the judge acquired knowledge of hotly contested facts concerning the circumstances under which the confession was given. He no doubt observed Petitioner's demeanor. He observed and experienced the conditions under which the confession had been extracted during the preceding thirty hours.

Since the seminal case of *Tumey v. Ohio*, 273 U.S. 510 (1927), the guiding constitutional principle has been settled: "[I]t certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case." *Tumey*, 273 U.S. at 523; *see also, Aetna Life Insurance Co. v. LaVoie*, 475 U.S. 813 (1986).

In the case of *In re Murchison*, 349 U.S. 133 (1955), the petitioners, Detroit policemen, were called as witnesses before a "one-man judge-grand jury." Incredulous of their testimony, the judge then charged both petitioners with perjury. The judge proceeded to try them in open court and to sentence them for contempt. In setting aside the convictions, Justice Black wrote:

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of

9

> unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases whenever he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that 'Every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law. [*Citing Tumey* 273 U.S. 510]. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh *the* scales of justice equally between contending parties. But to perform its high function in the best way, 'justice must satisfy the appearance of justice.' *Offutt v. United States,* 348 U.S. 11, 14 (1954).
>
> . . . A single 'judge-grand jury' is even more a part of the accusatory process than an ordinary lay grand juror. Having been a part of that process a judge cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused. While he would not likely have all the zeal of a prosecutor, it can certainly not be said that he would have none of that zeal. Fair trials are too important a part of our free society to let prosecuting judges be trial judges of the charges they prefer.

*Murchison*, 349 U.S. at 136-37.

It is the duty of law enforcement officers, as a part of their accusatorial role, to give notice of *Miranda* before conducting a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436 (1966); *United States v. Bosby*, 675 F.2d 1174, 1181 (11th Cir. 1982).

Criminal defendants are guaranteed the right to present a complete defense. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (holding that excluding testimony about the circumstances of a confession deprives a defendant of his constitutional right to present a complete defense).

In deciding whether a confession is voluntary, a court should consider the "totality of the circumstances," *Id*. at 227. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

Indeed, the judge assumed the role of the prosecutor. He eschewed his judicial role of simply entering an order requiring the sheriff and deputies to permit access to Petitioner by the lawyer hired by Petitioner's father. Instead, armed with extra-judicial facts from extraneous and unknown sources (e.g., "Now I know you've been explained your rights so far," "Now, its my understanding that you told them you do not wish to have an attorney with you: is that correct?"), he proceeded to inform Petitioner of his *Miranda* rights. But even more appalling is that on *four separate occasions*, in the presence of the district attorney and law enforcement officers, Judge Monk advised Petitioner that he had a right *not* to talk with the lawyer retained by Petitioner's father. No other constitutional right was emphasized so repetitively by the judge.

It is most unreasonable to assume that the judge acquired no knowledge of at least some of the facts surrounding Petitioner's fourth confession when he visited Petitioner during the pre-indictment investigatory stage of this case. He certainly heard Petitioner exclaim: "I'm just upset." (R. 744.) The judge was certainly a witness to (1) the conditions of the interrogation room, (2) Petitioner's demeanor and mental/emotional state, (3) the appearance of the law enforcement officials in the interrogation room.

If the judge had testified at trial as a witness, and confirmed the testimony of Attorney Lybrand and parts of the testimony of Petitioner, his testimony would likely have carried much more weight than the testimony of other witnesses. His refusal to recuse himself deprived Petitioner of that opportunity.

The other side of this double-edged sword is that the judge was the fact finder on the voluntariness issue before it was submitted to the jury. How could he possibly have approached this judicial function without at least the subconscious recognition of his personal knowledge of some of the facts surrounding the confession?

For these reasons, Petitioner has been denied his right to a fair trial by a fair tribunal as well as his right to present a full and complete defense.[5] He is entitled to a writ of habeas corpus on this claim.

**IV.     Petitioner's Claim That The Jury Improperly Considered Extraneous Evidence**

The Court approves and expressly adopts herein Section IV (pages 35-38) of the R&R of the Magistrate Judge.

**V.     Petitioner's Claim That He Was Deprived Of A Fair Trial Because One Of The Jurors Failed To Adequately Answer Voir Dire Questions**

The Court approves and expressly adopts herein Section V (pages 38-44) of the R&R of the Magistrate Judge.

**VI.     Petitioner's Claim That His Statements Should Not Have Been Admitted Because They Were Involuntary And Obtained In Violation Of The Right To Counsel**

The Court approves and expressly adopts herein Section VI (pages 44-50) of the R&R

---

[5] The state courts and the Magistrate Judge's R&R do not address the implications of *Tumey* and *Murchison*. Clearly, they are controlling precedents of the United States Supreme Court.

of the Magistrate Judge.

**VII.    Petitioner's Claim That He Was Deprived Of The Right To A Fair Trial By The State's Racially Discriminatory Use Of Its Peremptory Challenges**

The Court approves and expressly adopts herein Section VII (page 50) of the R&R of the Magistrate Judge.

**VIII.   Petitioner's Claim That He Received Ineffective Assistance Of Counsel Due To His Trial Counsel's Failure To Object To The State's Racially Discriminatory Use Of Its Peremptory Challenges**

The Court approves and expressly adopts herein Section VIII and IX (pages 51-53) of the R&R of the Magistrate Judge.

For the reasons stated herein, the Petition for a Writ of Habeas Corpus was granted.

Done this 16th day of February, 2005.

_____
U.W. Clemon
Chief United States District Judge